UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JENNIFER MACKIE and JENNIFER COLLMAN, <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SANTA CRUZ, et al., <br><br> Defendants. | Case No. 19-CV-02096-LHK <br><br> **ORDER DENYING MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** <br><br> Re: Dkt. No. 55 |

Plaintiffs Jennifer Mackie and Jennifer Collman (collectively, the "Plaintiffs") bring this action against Defendants County of Santa Cruz, Santa Cruz County Sheriff's Office, Deputy Gabriel Gonzalez (collectively, the "Named County Defendants"); Ralph Millar; Peggy O'Connor; and Does 1–25. ECF No. 50. Before the Court is the Named County Defendants' motion to dismiss the Second Amended Complaint. ECF No. 55. Having considered the submissions of the parties, the relevant law, and the record in this case, the Court DENIES the Named County Defendants' motion to dismiss the Second Amended Complaint.

## I. BACKGROUND

### A. Factual Background

On May 27, 2018, Plaintiff Jennifer Mackie entered a lease for a home located in Santa

Cruz County, where Mackie planned to live with her teenage daughter. Second Amended Complaint ("SAC"), ECF No. 55 ¶ 8. Mackie's landlord, Defendant Peggy O'Connor, furnished Mackie with two sets of keys and offered no indication that Mackie's neighbor, Defendant Ralph Millar, had access to the home. *Id.* However, a month after Mackie moved into the home, on June 27, 2018, Mackie left Mackie's daughter home alone while Mackie visited a local bookstore. *Id.* ¶ 9. At the bookstore, Mackie was contacted by Mackie's daughter. *Id.* Mackie's daughter informed Mackie that Millar had entered their home. *Id.* Mackie contacted the Santa Cruz County Sheriff's Office and returned home. *Id.* When Mackie arrived, Mackie's daughter recounted that Millar had knocked on the door and rang the doorbell. *Id.* ¶ 10. Mackie's daughter had not answered, and Millar had then proceeded to attempt to enter the home through several other doors. *Id.* Eventually, Mackie's daughter heard him "jingle what sounded like keys" outside the kitchen door, which prompted the daughter to hide in the bathroom. *Id.* Millar then spent roughly twenty minutes in the home before Millar departed. *Id.*

Mackie swiftly confronted Millar about the incident, and Millar was initially friendly. *Id.* ¶ 11. At first, Millar asked whether Mackie had any questions about the newly rented home. *Id.* When Mackie pointedly asked whether Millar had been inside the home earlier in the day, Millar admitted that Millar had been. *Id.* Millar explained that Millar had been worried that Mackie's dog had been left home alone. *Id.* When Mackie informed Millar that the dog had not been left alone and that, in fact, Mackie's daughter had also been home, Millar grew upset. *Id.* Millar argued that Mackie's daughter should have answered the door when Millar knocked. *Id.* ¶ 12. Mackie then told Millar that Mackie had called the Santa Cruz County Sheriff's Office about the incident, at which point Millar became more hostile. *Id.* ¶¶ 12–13. Millar told Mackie that no one at the Santa Cruz County Sheriff's Office would care about the incident. *Id.* Millar threatened Mackie, screamed profanities and epithets at Mackie, and demanded that Mackie remove herself from Millar's porch. *Id.* ¶ 13. Millar also said that Mackie would "be sorry" if Mackie contacted the Santa Cruz County Sheriff's Office again. *Id.*

Mackie returned to her home and once again called the Santa Cruz County Sheriff's

Office, which dispatched Defendant Deputy Gabriel Gonzalez and another officer to meet Mackie. *Id.* ¶ 14. When the officers arrived, Mackie relayed to them both Millar's earlier unauthorized entry into her home and Millar's hostility toward Mackie. *Id.* According to the SAC, Mackie relayed the interaction with Millar "in detail," including Millar's threat that Mackie would "be sorry" if Mackie contacted the police again. *Id.* The two officers allegedly responded with nonchalance. *Id.* ¶ 15. The officers informed Mackie that, on the basis of Mackie's own account, Millar had committed only misdemeanors. *Id.* When Mackie asked the officers to assess whether Millar was dangerous, the officers responded by advising Mackie to obtain a restraining order if Millar entered her home again. *Id.* Over the next month-and-a-half, Mackie repeatedly contacted the Santa Cruz County Sheriff's Office in an effort to secure an incident report that Mackie hoped to use to terminate the lease without penalty so that "[Mackie] and her daughter could move somewhere where they would feel safe." *Id.* ¶¶ 16, 18. Mackie never received a response. *Id.*

One day, on August 15, 2018, Deputy Gonzalez made an unannounced visit to Mackie's street. *Id.* ¶ 19. After Deputy Gonzalez arrived, Deputy Gonzalez saw Millar "apparently drinking from a can of beer" while Millar walked on the street. *Id.* Deputy Gonzalez asked Millar what Millar was drinking, but Millar did not respond and, instead, walked inside his house and locked his door. *Id.* ¶¶ 19–20. Deputy Gonzalez approached Millar's house and pounded on Millar's front window, but Millar did not respond. *Id.* Deputy Gonzalez then walked to a side gate and called out to Millar, before Deputy Gonzalez returned to Millar's front window and pounded on the window a second time. *Id.* ¶ 21. After this, Deputy Gonzalez walked into the backyard of a house adjacent to Millar's house and peered over Millar's fence. Deputy Gonzalez told Millar, "Hey, I can see you. Why don't you come talk to me and be a man? Why are you running away from me? Why don't you man up and come talk to me? Huh?" *Id.* Deputy Gonzalez then told Millar to "stay away from [Mackie]." *Id.* ¶ 22. Millar did not verbally respond to Deputy Gonzalez and instead "flipped [Deputy Gonzalez] off." *Id.* Deputy Gonzalez then left the backyard and pounded on Millar's front window a third time before Deputy Gonzalez walked across the street to Mackie's house. *Id.*

At Mackie's house, Deputy Gonzalez and Mackie shared an exchange at Mackie's door. *Id.* ¶¶ 23–25. At the time, Plaintiff Jennifer Collman, Mackie's friend, was visiting Mackie. *Id.* ¶ 24. Deputy Gonzalez claimed that, per Mackie's request, Deputy Gonzalez had attempted to engage with Millar, but Millar had seemingly been avoiding Deputy Gonzalez. *Id.* ¶ 23. When Mackie pressed Deputy Gonzalez about the possibility of receiving an investigation report, Deputy Gonzalez informed Mackie that the Santa Cruz County Sheriff's Office had not generated a case number because Mackie had declined to press charges against Millar. *Id.* ¶ 24. Mackie repeated her account of the events that had occurred on June 27, 2018 and stressed to Deputy Gonzalez Mackie's desire for an incident report to use to terminate her lease because "she and her daughter were 'terrified' of Millar." *Id.* ¶¶ 24–25. Mackie informed Deputy Gonzalez that Mackie wanted to move out of the apartment "for her safety and that of her daughter." *Id.* ¶ 25. Deputy Gonzalez responded by providing Mackie with a case number written on the back of a business card, and Deputy Gonzalez assured Mackie that Deputy Gonzalez would follow up by preparing an incident report. *Id.*

Near the end of the exchange, Millar appeared in his doorway across the street, and Millar watched Mackie talk with Deputy Gonzalez. *Id.* ¶ 26. Deputy Gonzalez walked across the street to speak to Millar, and Deputy Gonzalez asked, "Do you want to come out?" *Id.* Millar responded by telling Deputy Gonzalez to "Get the fuck off my property. Don't you dare step a fucking foot onto my property." *Id.* Deputy Gonzalez told Millar to relax and told Millar to "[c]alm down," to which Millar responded that, "Those are the last words you're ever fucking going to hear." *Id.* The exchange continued, and Deputy Gonzalez again told Millar to "[s]tay away from" Mackie. *Id.* ¶ 27. Millar responded that Millar "never fucking harassed anyone," and that Deputy Gonzalez had "got a blow job" from Mackie, who Millar referred to as a "whore." *Id.* ¶ 27. During this exchange, both accused the other of escalating the situation. Millar told Deputy Gonzalez, "Fuck you[,] you[']r[e] escalating the goddamn situation," and then screamed at Deputy Gonzalez to "[c]all for fucking back up, you piece of shit." *Id.* ¶¶ 27–28.

Deputy Gonzalez did not call for back up. Instead, Deputy Gonzalez continued the

Case No. 19-CV-02096-LHK
ORDER DENYING MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

conversation with Millar.  Deputy Gonzalez told Millar, "Look at you, you're making a scene." *Id.* ¶ 28.  Millar responded, "That's because you've been harassing me.  This isn't the first fucking time." *Id.*  Deputy Gonzalez asked Millar to come outside.  *Id.*  In response, Millar struck Millar's security door and yelled, "You'll fucking tase me and shit.  Fuck you, you're a piece of shit, pig.  I hate every fucking pig!" *Id.* ¶ 28.  Deputy Gonzalez responded to Millar's aggression and stated, "Look at you, look at you," and, "You're making a big deal out of nothing." *Id.*  Millar screamed back, "You're so nothing.  You'll arrest me if I come out of here, you'll fucking arrest me." *Id.*  Deputy Gonzalez asked Millar, "[A]rrest you for what?  Open alcohol container?" *Id.* ¶ 29.  At this time, Millar again told Deputy Gonzalez to get off Millar's property, and Millar hurled numerous racial epithets at Deputy Gonzalez.  *Id.*

As the exchange continued, Deputy Gonzalez asked Millar if there was "[a]nything else?" *Id.* ¶ 30.  Millar responded by turning his rancor on Mackie.  *Id.*  Millar called Mackie a "fucking bitch [who had] better not call the goddam cops on me one more [] time." *Id.*  Deputy Gonzalez did not clarify to Millar that Mackie had not called the police.  Instead, Deputy Gonzalez told Millar that Mackie "can call us whenever she wants." *Id.*  Millar repeated that Deputy Gonzalez was harassing Millar and insisted that the police are "armed thugs." *Id.*

In addition, Millar began to make sexually explicit comments to Deputy Gonzalez.  Millar told Deputy Gonzalez that Deputy Gonzalez could "suck [Millar's] dick" and that Millar "ha[dn't] had a blow job in a long time." *Id.* ¶ 32.  Deputy Gonzalez responded that Deputy Gonzalez "c[ould] tell," which prompted Millar to tell Deputy Gonzalez to "[c]ome over here and suck my dick." *Id.*  Millar also professed to enjoy watching the murder of police officers on YouTube, and Millar said that Millar "love[d] seeing [the police] get fucking killed." *Id.*

Toward the end of the exchange, Millar again directed his anger toward Mackie.  *Id.* ¶ 33.  Millar called Mackie a "a lying cunt." *Id.*  Millar also told Deputy Gonzalez that Millar had "a list of five Sunnyvale Police Department officers that I will kill one fucking day if I ever develop cancer." *Id.*

Millar eventually taunted Deputy Gonzalez, "Drop your gun belt and come on my

property. I'll kick your fucking ass. God damn—God fucking damn you, and that bitch [Mackie] across the street." *Id.* ¶ 34. Millar then directly addressed Mackie—who was standing across the street at her house—and said, "Fuck you, Jen. Fuck you and your fucked[-]up daughter. What's wrong with your fucking daughter?" *Id.* Deputy Gonzalez told Millar that, "It [would] all be documented in the police report, I hope you are happy," and to "have a good day." *Id.*

Deputy Gonzalez began to return to his car, and Millar yelled that Deputy Gonzalez "c[ould] document all [he] want[ed]." *Id.* Millar continued to yell at Deputy Gonzalez and said that the police would "never get a chance to put fucking [handcuffs] on him." *Id.* ¶ 35. Deputy Gonzalez responded that Millar was "a real piece of work," before Deputy Gonzalez mentioned his body camera. *Id.* Millar once again called Deputy Gonzalez a racial slur, and Deputy Gonzalez responded that the comment was "not nice." *Id.* ¶ 35.

Once the exchange concluded, Deputy Gonzalez returned to his vehicle and departed from the scene. *Id.* ¶¶ 35–37. As Deputy Gonzalez drove away, Millar stormed over to Mackie's home, where Millar punched a hole in the screen door and attempted to gain entrance. *Id.* ¶ 37. Unable to enter, Millar retreated across the street toward his own house, where a former girlfriend met him. *Id.* Millar ranted to his former girlfriend that Mackie had ruined his life and that Millar would be sent to jail. *Id.* Millar returned to his home while his former girlfriend engaged with Mackie. *Id.*

Millar soon reemerged armed with a handgun. *Id.* ¶ 38. Mackie and Collman fled into Mackie's house, where Mackie and Collman barricaded themselves in the bathroom. *Id.* Mackie and Collman soon heard Millar batter down the front door. *Id.* Millar proceeded to the bathroom and fired multiple rounds through the closed door; Mackie was struck by bullets twice. *Id.* Collman called 9-1-1, and police officers were dispatched to the scene. *Id.* ¶¶ 38–39. When the police arrived, the officers guided Collman to safety and arranged for an emergency airlift for the wounded Mackie. *Id.* ¶ 40. At some point in the tumult, Millar retreated to his home and Millar was subsequently apprehended by a Santa Cruz County Sheriff's Office SWAT team. *Id.* ¶ 41.

**B. Procedural History**

Plaintiffs filed a complaint against the Named County Defendants, Ralph Millar, Peggy O'Connor, and Does 1–25 in the Superior Court for the County of Santa Cruz, California.  ECF No. 1 ("Notice of Removal") at 1; ECF No. 1-1 at 3.[1]  On April 18, 2019, the Named County Defendants removed the case to federal court pursuant to 28 U.S.C. § 1441(a) and (c) and cited the complaint's inclusion of a claim arising under 42 U.S.C. § 1983.  Notice of Removal at 2.

On June 13, 2019, Plaintiffs filed the First Amended Complaint ("FAC").  Several weeks after the FAC was filed, on June 27, 2019, the Named County Defendants moved to dismiss the FAC's claims against them.  ECF No. 26.  On August 21, 2019, this Court granted without prejudice the Named County Defendants' motion to dismiss.  ECF No. 44.

On September 27, 2019, Plaintiffs filed the Second Amended Complaint ("SAC").  ECF No. 50.  The SAC lists nine causes of action, and the bulk of them are state law claims against Millar and O'Connor.  *See* SAC ¶¶ 42–88.  Because Millar and O'Connor are not party to the instant motion, we need not consider these causes of action.  The SAC's last two causes of action, however, are alleged against the Named County Defendants.  Specifically, the SAC alleges a claim under 42 U.S.C. § 1983 against the Named County Defendants (the eighth cause of action).  Further, the SAC alleges a claim for California common law negligence against the Named County Defendants (the ninth cause of action).[2]

On October 18, 2019, the Named County Defendants moved to dismiss the SAC's claims against them.  ECF No. 55 ("Mot.").  Plaintiffs opposed the motion on December 23, 2019, ECF No. 62 ("Opp'n"), and the Named County Defendants replied on January 13, 2020.  ECF No. 63

---

[1] The initial complaint also named Sheriff-Coroner Jim Hart as a defendant, but Plaintiffs did not name him as a defendant in either the FAC or SAC.

[2] The Court notes that the SAC alleges the ninth cause of action against "Defendants Gonzalez and Does, County and LASO," but does not list the Santa Cruz County Sheriff's Office.  However, the SAC does not mention or define "LASO" outside of the ninth cause of action, and Plaintiffs' opposition to the County Defendants' motion refers to the Santa Cruz County Sheriff's Office in place of "LASO."  *See* Opp'n at 16 ("Plaintiffs . . . [allege] the negligence of Deputy Gonzalez and perhaps of certain as yet unnamed public employees, and the County's and [Santa Cruz County Sheriff's Office]'s vicarious liability arising therefrom.")  Accordingly, the Court construes the SAC as asserting a negligence claim against the Santa Cruz County Sheriff's Office instead of the undefined "LASO."

7

("Reply").

## II.     LEGAL STANDARD

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6). Rule 8(a) requires a plaintiff to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The Court, however, need not accept as true allegations contradicted by judicially noticeable facts, *see Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000), and it "may look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6) motion into a motion for summary judgment, *Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995). Nor must the Court "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam). Indeed, mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

## III.     DISCUSSION

As mentioned, Plaintiffs' SAC asserts nine causes of action, only two of which Plaintiffs assert against the Named County Defendants and are therefore relevant to the instant motion. These consist of a claim under 42 U.S.C. § 1983 (the eighth cause of action) and a claim under California common law negligence (the ninth cause of action).

The Named County Defendants move to dismiss both of the foregoing claims. As to Plaintiffs' § 1983 claim against Deputy Gonzalez, the Named County Defendants argue that the so-called "state-created danger" doctrine is not applicable to this case. As to Plaintiffs' § 1983 claim against the County of Santa Cruz and the Santa Cruz County Sheriff's Office, the Named County Defendants argue that the two government entities are not liable under *Monell*. Finally, as to Plaintiffs' negligence claims, the Named County Defendants argue that California Government Codes §§ 815, 820.2, and various other statutory provisions confer immunity to the Named County Defendants in this context. The Court considers these arguments in turn.

### A. The SAC Sufficiently Pleads the State-Created Danger Exception to 42 U.S.C. § 1983

In order to state a claim under 42 U.S.C. § 1983, Plaintiffs must allege that "(1) the conduct that harm[ed] [Plaintiffs] [was] committed under color of state law (*i.e.*, state action), and (2) the conduct . . . deprive[d] [Plaintiffs] of a constitutional right." *Ketchum v. Alameda Cty.*, 811 F.2d 1243, 1245 (9th Cir. 1987). When ruling on a motion to dismiss for failure to state a claim, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek*, 519 F.3d at 1031.

In the ordinary course, "members of the public have no constitutional right to sue state actors who fail to protect them from harm inflicted by third parties." *Johnson v. City of Seattle*, 474 F.3d 634, 639 (9th Cir. 2007). However, there are two exceptions to this rule. First, a cause of action may lie when a "special relationship" exists between the plaintiff and the state. *See, e.g.*, *Patel v. Kent School Dist.*, 648 F.3d 965, 971 (9th Cir. 2011). Second, a cause of action may lie when the plaintiff's harm flows from a "state-created danger." *See id.* at 974. If either exception is present, it may be possible for a plaintiff to bring a claim under 42 U.S.C. § 1983 to recover from state actors who have failed to protect them from harm inflicted by a third party. In any event, a plaintiff must allege facts showing that the police placed the plaintiff in a "worse position than that in which he would have been had [the police] not acted at all." *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 201 (1989).

Plaintiffs argue that the "state-created danger" exception applies to the instant case. *See*

9

United States District Court
Northern District of California

Opp'n at 7 ("The SAC Alleges a Deprivation of Plaintiffs' Fourteenth Amendment Right to Be Free from Official Deliberate Indifference to a State-Created Danger"). Accordingly, the Court proceeds to consider whether Plaintiffs may recover against Deputy Gonzalez under the "state-created danger" exception of 42 U.S.C. § 1983.

To meet the requirements of the state-created danger exception, Plaintiffs must show: (1) that Deputy Gonzalez "create[d] or expose[d] [Plaintiffs] to a danger which [they] would not have otherwise faced"; and (2) that Deputy Gonzalez "acted with deliberate indifference" to that danger. *Kennedy v. Ridgefield City*, 439 F.3d 1055, 1061–64 (9th Cir. 2006). The Court finds that the SAC sufficiently alleges both of these requirements. The Court addresses each prong of the state-created danger exception in turn.

### 1. The SAC Sufficiently Pleads that Deputy Gonzalez's Affirmative Actions Exposed Plaintiffs to Danger

First, the Court finds that Plaintiffs sufficiently plead that Deputy Gonzalez's actions "create[d] an actual, particularized danger" to Plaintiffs. *Hernandez v. City of San Jose*, 897 F.3d 1125, 1131 (9th Cir. 2018). In order to meet this requirement, Plaintiffs must show that Deputy Gonzalez "affirmatively place[d] the[m] [] in a position of danger," such that Deputy Gonzalez's "action[s] create[d] or expose[d]" them to "a danger which . . . [they] would not have otherwise faced." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) (citing *DeShaney*, 489 U.S. at 197) (internal quotation marks omitted). Furthermore, "[t]he affirmative act [by Deputy Gonzalez] must [have] create[d] an actual, particularized danger, and the ultimate injury to the plaintiffs must [have] be[en] foreseeable." *Hernandez*, 897 F.3d at 1133. In other words, Plaintiffs must allege: (1) that Deputy Gonzalez's affirmative actions created or exposed Plaintiffs to an actual, partialized danger; and (2) that these affirmative actions led to a foreseeable injury.

In the SAC, Plaintiffs point to numerous affirmative actions that Deputy Gonzalez committed and that the Plaintiffs allege, taken as a whole, satisfy the foregoing requirements. These actions include: "confronting Millar," "spying on [Millar] in his backyard," "insulting [Millar's] masculinity and warning him to stay away from [Plaintiff] Mackie," "contacting Mackie

at her home in broad daylight as if she had summoned deputy sheriffs," "contacting Millar regarding her prior complaint," "not correcting [Millar] when Millar said 'that bitch' called law enforcement," "working [Millar] into a deranged and threatening state," and "leaving the scene without calling for backup or taking any action to warn or protect Plaintiffs." SAC ¶ 74. Plaintiffs allege that these actions "work[ed] [Millar] into a deranged and threatening state," and when Deputy Gonzalez left the scene "without calling for backup or taking any action, Deputy Gonzalez affirmatively created a serious risk of harm to Plaintiffs." *Id.*

The Named County Defendants argue that these actions are insufficient to satisfy the first prong of state-created danger. *See* Mot. at 9–10. Specifically, the Named County Defendants argue that the SAC fails to sufficiently allege that Deputy Gonzalez exposed Plaintiffs to danger because the SAC does not allege "that [Deputy] Gonzalez taunted Millar regarding Mackie," that "[Deputy] Gonzalez encouraged Millar to harm Plaintiffs," "that [Deputy] Gonzalez armed Millar," or that Deputy Gonzalez "had any actual knowledge that Millar was armed or had access to weapons." *Id.* at 10. As such, the Named County Defendants argue that "[t]he only foreseeable known danger was that Millar would continue to verbally berate [Deputy] Gonzalez as long as he was present." *Id.*

The Court disagrees. The Court finds that the SAC alleges facts that plausibly show that Deputy Gonzalez's interaction with Millar left Millar in an agitated state and that this interaction increased the risk to Plaintiffs and led to a foreseeable injury. The Court first addresses how Deputy Gonzalez's affirmative actions plausibly exposed Plaintiffs to an actual, particularized danger, before turning to whether the ultimate injury was foreseeable.

### a. *Deputy Gonzalez's Actions Plausibly Increased Plaintiffs' Risk to an Actual and Particularized Danger*

As an initial matter, the Court disagrees with the Named County Defendants' contention that the state-created danger exception cannot apply when a state actor only increases the risk of danger, rather than literally creates the danger. *Id.* at 9. The Ninth Circuit has expressly noted that "[w]hether the danger already existed is not dispositive" to the state-created danger inquiry, and

instead courts look to whether the state actor's affirmative actions exposed the plaintiff to a "greater danger." *See Martinez v. City of Clovis*, 943 F.3d 1260, 1271–72 (9th Cir. 2019) (finding a state created danger where police officers responding to a domestic violence call and then left a woman at a greater risk of additional abuse); *see also Hernandez*, 897 F.3d at 1133 (finding that officers directing attendees of a political rally into an area with protesters "increased the danger" to the rally attendees). Thus, the Court asks whether Deputy Gonzalez undertook affirmative actions that "increased the danger" Plaintiffs faced.

Here, the Court finds it plausible that Deputy Gonzalez's actions left Millar in an agitated state and thereby increased the risk that Millar would attack Plaintiffs. Plaintiffs allege that "[h]ad Deputy Gonzalez not parked near Mackie's home, and then confronted Millar about staying away from Mackie, violating Millar's privacy in the process, Mackie would not have been shot." SAC ¶ 75. Particularly, prior to Deputy Gonzalez's arrival and interactions with Millar, Millar was not in an aggressive state and was merely "walking on the . . . street, apparently drinking from a can of beer." *Id.* ¶ 19. Only after Deputy Gonzalez affirmatively engaged and spoke with Millar did Millar become agitated. *See generally id.* ¶¶ 27–35 (detailing Millar's statements and actions during and at the end of Millar's exchange with Deputy Gonzalez). Indeed, the Named County Defendants do not appear to argue that Millar would have violently attacked Plaintiffs that day in the absence of Millar's interaction with Deputy Gonzalez. *See* Mot. at 9–10.

Instead, the Named County Defendants argue that Deputy Gonzalez's actions were insufficient to increase the danger because the SAC does not "allege[] that [Deputy] Gonzalez taunted Millar regarding Mackie" or "encouraged Millar to harm Plaintiffs." *Id.* at 10. Whether Deputy Gonzalez's taunts explicitly referenced Mackie is irrelevant because Plaintiffs allege that Deputy Gonzalez taunted Millar in a manner that necessarily implicated Mackie. *See* SAC ¶ 74. Specifically, Deputy Gonzalez aggressively confronted Millar regarding Millar's interactions with Mackie, and Millar believed that Deputy Gonzalez's visit stemmed from Mackie's previous complaints. *See id.* In this context, the SAC alleges that Deputy Gonzalez "insult[ed] [Millar's] masculinity." *Id.* ¶¶ 36, 74; *see also id.* ¶ 22 (quoting Deputy Gonzalez as telling Millar "Why

12

don't you come talk to me and be a man?").  Further, the SAC alleges that Deputy Gonzalez acted

aggressively toward Millar by "pounding on [Millar's] window [and] invading [Millar's] privacy,"

*id.* ¶ 36, as well as making provocative statements, such as when Deputy Gonzalez asked Millar

"Anything else, sir?" near the end of their exchange.  *Id.* ¶ 31.  The SAC alleges that Deputy

Gonzalez's taunts served to direct Millar's rage toward Mackie, and that Millar viewed Mackie as

the driving force behind Deputy Gonzalez's taunts and "harassment."  Indeed, in the same

conversation, Deputy Gonzalez repeatedly brought up Mackie and told Millar that Mackie "can

call [the police] whenever she likes."  *Id.* ¶ 30.   In light of the fact that Deputy Gonzalez's

interaction with Millar centered on Mackie's complaints, the Court finds it a reasonable inference

that Deputy Gonzalez's taunts served to incite Millar's aggression towards Mackie in particular.

Therefore, viewed in the light most favorable to Plaintiffs, the Court finds it is a reasonable

inference that Deputy Gonzalez's actions increased Plaintiffs' exposure to an actual and

particularized danger.  Once Millar became agitated by this interaction, Deputy Gonzalez then left

Plaintiffs "in a situation that was more dangerous than the one in which [Deputy Gonzalez] found

[them]."  *See Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000)

("[W]e examine whether the officers left the person in a situation that was more dangerous than

the one in which they found him").  Thus, the Court finds that the SAC plausibly alleges that

Deputy Gonzalez's interactions with Millar, and Deputy Gonzalez's subsequent departure from

the scene, increased Plaintiffs' exposure to an actual, particularized danger.

> b.  *The Ultimate Injury to Plaintiffs Was Plausibly Foreseeable*

The Court now turns to the question of whether Plaintiff's injury was foreseeable.  The

Court is unpersuaded by the Named County Defendants' contention that Millar firing a gun at

Plaintiffs was unforeseeable.  *See* Mot. at 10 ("The only foreseeable known danger was that Millar

would continue to verbally berate [Deputy] Gonzalez as long as he was present."); *see also*

*Hernandez*, 897 F.3d at 1133 ("The affirmative act must create an actual, particularized danger,

and the ultimate injury to the plaintiffs must be foreseeable." (internal citations omitted)).  For

foreseeability in the context of state-created danger, the Ninth Circuit has "*never required* that, for

13

a danger to exist, the exact injury inflicted by a third party must have been foreseeable.  Instead, the state actor is liable for creating the *foreseeable danger of injury* given the particular circumstances."  *Kennedy*, 439 F.3d at 1064 n.5 (emphasis added).

For instance, in *Wood v. Ostrander*, the Ninth Circuit addressed whether a state trooper's actions fulfilled the requirements for state-created danger when the trooper impounded a female driver's car, "strand[ing] [the driver] in a high-crime area at 2:30 a.m."  879 F.2d 583, 590 (9th Cir. 1989).  The driver was later picked up by a passerby and raped.  *Id.* at 586.  In addressing whether the injury was foreseeable, the Ninth Circuit did not look at whether the rape *specifically* was foreseeable but instead looked at the broader risk of danger.  *Id.* at 590 ("Moreover, the inherent danger facing a woman left alone at night in an unsafe area is a matter of common sense.").  Thus, the inquiry in the present case is not whether Millar shooting at Plaintiffs was itself foreseeable, but instead whether the overall increased danger of injury to Plaintiffs was foreseeable to Deputy Gonzalez.

The Court finds that the volatile nature of Millar's interaction with Deputy Gonzalez, as well as Millar's highly aggressive statements, plausibly made violence foreseeable.  In the SAC, Plaintiffs allege that Millar repeatedly referred to violence or threatened violence.  *See generally* SAC ¶¶ 23–35.  These statements included: "Those are the last words you're ever fucking going to hear," *id.* ¶ 27, "I laugh when [police officers] get killed. . . . I love seeing you guys get fucking killed," *id.* ¶ 32, "I have a list of five Sunnyvale Police Department officers that I will kill . . . if I ever develop cancer," *id.* ¶ 33, and "You'll never have a chance to put fucking [handcuffs] on me."  *Id.* ¶ 35.  While Millar's most aggressive statements were largely directed at Deputy Gonzalez and to police officers in general, the SAC alleges that Millar also targeted Mackie with his vitriol.  *See* Opp'n at 11–12.  Millar's statements with regards to Mackie included referring to Mackie as a "fucking whore," SAC ¶ 27, and "a lying cunt," *id.* ¶ 33, as well as threatening that "that fucking bitch [Mackie], better not fucking call the goddam cops on me one more time."  *Id.* ¶ 30.

Moreover, Deputy Gonzalez was aware of the fact that Millar had *already* threatened

14

Mackie and that Millar had earlier "dared [Mackie] to call the [Santa Cruz County Sheriff's Office] again, threatening, 'You'll be sorry.'" *Id.* ¶ 13. Deputy Gonzalez also knew that Mackie and her daughter were "terrified" of Millar, in light of these past threats. *Id.* ¶ 25.

Furthermore, the SAC alleges that Millar believed Mackie to be the driving force behind Deputy Gonzalez's appearance and actions, which further demonstrates that Millar's violence towards Plaintiffs was foreseeable. Specifically, the SAC alleges that Millar believed that Mackie had called Deputy Gonzalez on Millar, and that Deputy Gonzalez did nothing to correct this impression. *See id.* ¶ 30. Indeed, Millar repeatedly tied Deputy Gonzalez's presence to Mackie, and Millar even referred to a sexual relationship between Mackie and Deputy Gonzalez. *See id.* ¶ 27. Taken together, Millar's statements served to demonstrate that Millar believed Mackie was behind Deputy Gonzalez's appearance and continued "harassment" of Millar.

Drawing all reasonable inferences in favor of the Plaintiffs, the Court finds that Millar's statements are reasonably construed as threats to *both* Deputy Gonzalez and Mackie. Thus, the Court concludes that the SAC plausibly alleges that Deputy Gonzalez's actions produced the foreseeable risk of injury to Plaintiffs when Deputy Gonzalez repeatedly taunted Millar and then departed from the scene. As such, the Court concludes that Plaintiffs' ultimate injury was foreseeable for the purposes of state-created danger.

In sum, the Court concludes that the SAC plausibly alleges that Deputy Gonzalez's actions increased Plaintiffs' exposure to an actual and particularized danger. The Court also concludes that Deputy Gonzalez's actions resulted in the foreseeable risk of injury to Plaintiffs. Accordingly, the Court finds that the SAC sufficiently pleads the first prong of state-created danger.[3]

## 2. The SAC Sufficiently Pleads that Deputy Gonzalez Acted with Deliberate

---

[3] The Named County Defendant's remaining arguments concerning the first prong of the state-created danger exception focus on Deputy Gonzalez's knowledge of the danger, which is more appropriately analyzed in the context of "deliberate indifference." *See, e.g.*, Mot. at 10 ("There was no indication, let alone 'known' or 'obvious' danger that Millar would subsequently retrieve a handgun, force his way into Mackie's home while she was there, and shoot at Plaintiffs.").

The Court now turns to the second prong of the state-created danger exception: whether Deputy Gonzalez displayed "deliberate indifference" to the danger. The Court finds that Plaintiffs sufficiently plead facts that plausibly show that Deputy Gonzalez acted with deliberate indifference to the increased risk that Millar posed to Plaintiffs. The Ninth Circuit has explained that the standard applied in determining "deliberate indifference is even higher than gross negligence—deliberate indifference requires a culpable mental state." *Patel v. Kent School Dist.*, 648 F.3d 965, 974 (9th Cir. 2011); *see also Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997) (characterizing deliberate indifference as a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions"). Thus, for the state-created danger exception to apply, a state actor must "recognize[] [an] unreasonable risk and actually intend[] to expose the plaintiff to such risks without regard for the consequences to the plaintiff." *L.W. v. Grubbs*, 92 F.3d 894, 899 (9th Cir. 1996). A defendant is therefore deliberately indifferent if the defendant "knows that something is going to happen but ignores the risk and exposes [the plaintiff] to it." *Id.* at 900. Therefore, the Court looks for whether the SAC pleaded sufficient facts to plausibly show that the danger to Plaintiffs was not just foreseeable, but that Deputy Gonzalez recognized and ignored an "unreasonable risk."

Plaintiffs allege that when Deputy Gonzalez agitated Millar and then left Millar alone with Plaintiffs, Deputy Gonzalez was deliberately indifferent to the danger Millar posed. *See* Opp'n at 9; SAC ¶¶ 74–75. However, the Named County Defendants argue that Deputy Gonzalez did not act with deliberate indifference because Deputy Gonzalez "was, at best, willfully blind to the consequences of his actions" and "did not recognize the danger that ultimately occurred, and . . . had no reason to [recognize the danger]." Mot. at 11. The Named County Defendants contend that Millar's exchange with Deputy Gonzalez was insufficient to inform Deputy Gonzalez of Millar's danger, and that Deputy Gonzalez had no knowledge that Millar possessed any weapons or had a violent nature. *Id.* at 9–11; Reply at 2–3. Plaintiffs respond that because of Deputy Gonzalez's knowledge of Millar's prior interactions with Mackie, as well as Deputy

Case No. 19-CV-02096-LHK
ORDER DENYING MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

own interactions with Millar, Deputy Gonzalez "consciously disregarded the substantial risk of harm to Plaintiffs." Opp'n at 7–12.

Ultimately, the Court concludes that the SAC sufficiently alleges facts that plausibly show that Deputy Gonzalez disregarded a known danger to Plaintiffs and thus acted with deliberate indifference when Deputy Gonzalez engaged Millar and then left the scene. The Court first addresses Deputy Gonzalez's own interactions with Millar, before turning to address the effect of the preexisting knowledge Deputy Gonzalez possessed.

### a. Deputy Gonzalez's Own Interactions with Millar Support Plaintiffs' Allegation of Deliberate Indifference

The Court finds that Deputy Gonzalez's own interactions with Millar on the day of the attack plausibly informed Deputy Gonzalez of the increased danger Millar posed to Plaintiffs. As addressed above in the context of foreseeability, the SAC alleges that as Millar grew increasingly agitated in response to Deputy Gonzalez's actions, Millar repeatedly referred to and threatened violence. *See generally* SAC ¶¶ 23–35 ("Those are the last words you're ever fucking going to hear," "I laugh when [police officers] get killed. . . . I love seeing you guys get fucking killed," "I have a list of five Sunnyvale Police Department officers that I will kill . . . if I ever develop cancer."). Drawing all reasonable inferences in favor of Plaintiffs, the Court finds that Millar's vitriolic comments are reasonably construed as threats of violence which would have made Deputy Gonzalez aware of a heightened risk of danger. As such, the Court finds it plausible that Millar's statements served to inform Deputy Gonzalez of the threat that Millar posed.

Further, with regard to Deputy Gonzalez's knowledge of the risk Millar posed to Plaintiffs specifically, as discussed *supra*, Millar's aggressive comments were not solely directed at Deputy Gonzalez or police officers. *See* Opp'n at 12. Instead, Millar also turned his vitriol on Mackie and threatened that Mackie "better not fucking call the goddamn cops on me one more time." *See* SAC ¶ 30. Millar's statements also indicate that Millar believed that Mackie was the driving force behind Deputy Gonzalez's appearance and Deputy Gonzalez's "harassment" of Millar. *See id.* ¶¶ 27, 30–31.

17

While the Named County Defendants argue that Deputy Gonzalez did not know or recognize the risk Millar posed to Plaintiffs because Millar's anger "was directed chiefly at Deputy Gonzalez, with a few erratic, vague references," the Court disagrees. Specifically, in light of Millar's extreme statements, Millar's repeated references to Mackie, and Millar's apparent belief that Mackie was the driving force behind Deputy Gonzalez's actions, the Court finds it plausible that Deputy Gonzalez knew of the increased threat Millar posed to Plaintiffs. Reply at 2. Thus, Plaintiffs plausibly allege that by engaging with Millar, agitating Millar, and leaving the scene without taking any preventative action whatsoever, Deputy Gonzalez disregarded a known or obvious consequence of his actions and, therefore, acted with deliberate indifference.

### b. Deputy Gonzalez's Prior Knowledge of Millar Further Supports Plaintiffs' Allegation of Deliberate Indifference

The Court finds that Deputy Gonzalez's prior knowledge of Millar also supports the allegation that Deputy Gonzalez was deliberately indifferent to the increased danger Millar posed to Plaintiffs. The Ninth Circuit has held that a state actor's knowledge of an individual's prior violent behavior weighs in favor of finding that the state actor acted with deliberate indifference to that individual's later violent acts. *See, e.g.*, *Kennedy*, 439 F.3d at 1064–65 (police officer had been told the eventual attacker was previously violent); *Martinez*, 943 F.3d at 1274 (that the eventual attacker "was already under investigation . . . for allegations of abuse . . . suggests that future abuse was a known or obvious danger"). Here, the parties dispute the significance of Deputy Gonzalez's knowledge of Millar's previous actions—namely, the incident in which Millar entered Mackie's house and later threatened Mackie. *See* SAC ¶¶ 10–13 (describing the previous incident). The parties disagree about whether such information plausibly informed Deputy Gonzalez that Millar was violent or dangerous. *Compare* Reply at 3 ("The home invasion was not violent. There was no allegation of any threat of violence, or firearm involved."), *with* SAC ¶ 76 ("Deputy Gonzalez knew about Millar['s] aggression against Plaintiff Mackie arising from the June 27 incident wherein Millar let himself into her home . . . , and then became outraged . . . and threaten[ed] [Mackie] with harm").

United States District Court
Northern District of California

The Court must accept all of Plaintiffs' factual allegations as true on a motion to dismiss. *See Jones v. Johnson*, 781 F.2d 769, 771 n.1 (9th Cir. 1986) ("[A]ny weighing of the evidence is inappropriate on a 12(b)(6) motion . . . ."). As such, the Court must accept Plaintiffs' allegations that Deputy Gonzalez knew the details of Millar's previous hostile interactions with Mackie. While the incident did not involve physical violence, Millar clearly threatened Mackie and stated that Mackie would "be sorry" if Mackie called the Santa Cruz County Sheriff's Office ever again. *See* SAC ¶¶ 12–13. Furthermore, Mackie repeatedly expressed her fear of Millar to Deputy Gonzalez and told Deputy Gonzalez that "[Mackie] and her daughter were 'terrified' of Millar." *Id.* ¶ 25. The Court finds that Millar's threats in the initial incident, as well as Mackie's expression of fear to Deputy Gonzalez, support the allegation that Deputy Gonzalez was deliberately indifferent to the increased risk Millar posed to Plaintiffs.

Indeed, despite Deputy Gonzalez's knowledge of the previous incident involving Millar, Deputy Gonzalez nonetheless taunted Millar, questioned Millar's masculinity, and left the scene without taking any precautions. *See id.* ¶¶ 21, 36. The Court finds that in light of Deputy Gonzalez's preexisting knowledge of Millar, as well as the previous incident involving Millar and Mackie, Deputy Gonzalez plausibly exhibited deliberate indifference to the danger Millar posed.

The Named County Defendants request that the Court take judicial notice of the fact that the "[Named] County Defendants had no knowledge regarding Defendant Ralph Millar's criminal history, other than a traffic infraction, in Santa Cruz County." ECF No. 56 at 1–2. The Court DENIES the Named County Defendants' motion for judicial notice. While the Court may "take judicial notice of 'matters of public record'" under Fed. R. Evid. 201, the Named County Defendants request that the Court take notice of the Named County Defendant's *knowledge* of a public record at the time of Deputy Gonzalez's actions, rather than the existence of the public record. *See, e.g.*, *Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001) (explaining that a court may take judicial notice of "matters of public record," but not facts that are "subject to reasonable dispute"). Whether or not the Named County Defendants, and particularly Deputy Gonzalez, *knew* the details of Millar's criminal record is "subject to reasonable dispute," and thus

19

inappropriate for judicial notice. *See id.* ("[A] court may not take judicial notice of a fact that is 'subject to reasonable dispute.'" (quoting Fed. R. Evid. 201(b)). Indeed, the SAC only alleges that "Deputy Gonzalez either knew or should have known that Millar had preexisting mental issues or possessed firearms," SAC ¶ 76, and that "people in the neighborhood [had] significant complaints about Millar's behavior." *Id.* ¶ 17. As such, the Court cannot take judicial notice of the fact that the Named County Defendants "had no knowledge regarding Defendant Ralph Millar's criminal history, other than a traffic infraction, in Santa Cruz County."

### c. Conclusion

In contrast to the SAC, the FAC contained only minimal description of Deputy Gonzalez's interaction with Millar. *See* FAC ¶¶ 16–17 (outlining allegations that consisted of "Millar hurl[ing] non-stop racial slurs, sexual invitations and violent threats towards Deputy Gonzalez and law enforcement in general, threatening to kill police, and reveling in his enjoyment at seeing police killed in YouTube videos."). The Court finds that the additional allegations in the SAC are of such an extreme and violent nature that they plausibly informed Deputy Gonzalez that Millar was a threat. Further, the SAC now alleges that Deputy Gonzalez expressly taunted Millar, and the SAC quotes specific provocative statements that Deputy Gonzalez said to Millar. *See, e.g.*, SAC ¶¶ 21, 27, 31 ("Why don't you come talk to me and be a man?"). In contrast, the FAC's allegations that Deputy Gonzalez provoked Millar were entirely conclusory in nature and failed to allege that Deputy Gonzalez made any specific comments. *See* FAC ¶¶ 16–18. The Court finds that these additions support Plaintiffs' allegation of deliberate indifference. As such, the Court finds that the SAC plausibly alleges that Deputy Gonzalez acted with deliberate indifference.

Millar's extreme response to his interaction with Deputy Gonzalez, combined with Deputy Gonzalez's prior knowledge regarding Millar, render it plausible that Deputy Gonzalez knew Millar posed an increased risk to Plaintiffs. Thus, the Court concludes that the SAC plausibly alleges that Deputy Gonzalez acted with deliberate indifference when Deputy Gonzalez engaged with Millar, agitated Millar, and then departed the scene.

Thus, the SAC sufficiently pleads both that Deputy Gonzalez exposed Plaintiffs to a

20

United States District Court
Northern District of California

foreseeable danger, and that Deputy Gonzalez was deliberately indifferent to that danger. The SAC therefore sufficiently pleads both prongs of the state-created danger exception. Accordingly, the Court DENIES the Named County Defendants' motion to dismiss Plaintiffs' 42 U.S.C. § 1983 claim against Deputy Gonzalez.

**B. The SAC Sufficiently Pleads Entity Liability Under *Monell***

Next, Plaintiffs allege that Defendants the County of Santa Cruz and the Santa Cruz County Sheriff's Office (collectively, the "Entity Defendants") are liable under 42 U.S.C. § 1983 on the basis of *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1977). SAC ¶¶ 79–83. This claim depends on the two Entity Defendants' alleged negligent hiring, alongside the Entity Defendants' failure to adequately train, retrain, supervise, and discipline their officers. *Id.* "In order to establish liability for governmental entities under *Monell*, a plaintiff must prove: (1) that the plaintiff possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (quotation marks, citation, and alterations omitted).

The Named County Defendants argue that Plaintiffs' *Monell* claim fails because the SAC does not sufficiently allege an underlying constitutional violation, and also that the SAC fails to sufficiently allege a policy, practice, or custom sufficiently tied to Plaintiffs' harm. *See* Mot. at 12. The Court finds that both of the Named County Defendants' arguments fail.

First, the Named County Defendants argue that "because Plaintiffs fail to allege a violation of a cognizable federally protected right by a state actor, no *Monell* claim can be established." *Id.* at 13. However, the Court finds that the SAC sufficiently pleads a 42 U.S.C. § 1983 claim against Deputy Gonzalez under the state-created danger exception. As such, the Named County Defendants' first argument against *Monell* liability fails.

Second, the Named County Defendants argue that Plaintiffs fail to sufficiently allege that a policy, practice, or custom existed so as to establish liability under *Monell*. *Id.* at 13–15. Specifically, the Named County Defendants argue that "[c]ounty inaction is simply inadequate to

state a federal due process claim." *Id.* at 13.  Further, the Named County Defendants claim that while "negligent hiring or supervision . . . is proscribed under *Monell*, such negligence [here is insufficient because the negligence is not] the proximate cause of the injuries suffered." *Id.* at 13.

Plaintiffs respond that "[t]he SAC alleges . . . specific inadequacies that evince deliberate indifference in training and supervision, but those detailed allegations are unnecessary to overcome a motion to dismiss."  Opp'n at 13.  Plaintiffs argue that under *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993), *Monell* claims "are not subject to 'heightened pleading standards.'" Opp'n at 13.  As such, according to Plaintiffs, a party sufficiently pleads a *Monell* claim even "if the claim is based on nothing more than a bare allegation that the individual officers' conduct conformed to official policy, custom, or practice." *Id.* (quoting *Leatherman*, 507 U.S. at 165).  Moreover, Plaintiffs argue that even under a higher threshold, the "key factual allegations [in the SAC] . . . surpass the *Twombly-Iqbal* threshold of plausibility." *Id.* at 14.  As such, the Plaintiffs argue that they have sufficiently pleaded a *Monell* claim against the Entity Defendants.

The Court agrees with Plaintiffs that *Monell* claims do not trigger a heightened pleading standard.  *See Leatherman*, 507 U.S. at 167–68.  However, the Court disagrees with Plaintiffs that the appropriate pleading standard is so low that even a "bare allegation" suffices.  *See* Opp'n at 13. Specifically, Plaintiffs' briefing ignores the Ninth Circuit's decision in *AE v. County of Tulare*, 666 F.3d 631 (9th Cir. 2012).  There, the Ninth Circuit interpreted the *Iqbal* pleading standards in the context of a *Monell* claim, and the Ninth Circuit stated:

> *First*, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. *Second*, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.

*AE*, 666 F.3d at 637 (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)) (emphasis added).  Indeed, the Ninth Circuit in *AE* explicitly acknowledged that the past requirement of "a

United States District Court
Northern District of California

bare allegation" for a *Monell* claim no longer applied, and the Ninth Circuit explained that the more recent *Starr v. Baca* "standard applies to *Monell* claims and should govern future pleadings." *Id.* As such, the Court turns to analyze the allegations in the SAC under the framework provided by *AE* and *Starr*.

The Court finds that the SAC sufficiently pleads a *Monell* claim against the Entity Defendants. First, the Court finds that the SAC does "not simply recite the elements of a cause of action" and instead outlines "sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr*, 652 F.3d at 1216. Particularly, the SAC alleges specific training failures "with regard to the interaction with crime victims and the perpetrators, including such perpetrators who are suffering from acute, mental instability, and exhibit violent tendencies." SAC ¶ 80. Further, the SAC alleges that the Named County Defendants "knew the substantial risk of harm caused by inadequate training and supervision, and consciously disregarded the danger by deliberately choosing not to take steps to prevent, or even diminish, the harmful consequences of these unlawful policies and practices." *Id.* ¶ 81. These allegations amount to more than a mere recitation of "elements of the cause of action," and instead plead facts relating to a specific policy. Likewise, Plaintiffs' allegations give the Named County Defendants "fair notice" because Plaintiffs' allegations detail the alleged failure to train in sufficient detail so as to inform the Named County Defendants of the basis for Plaintiffs' *Monell* claim.

Second, the Court finds that "the factual allegations that are taken as true [] plausibly suggest an entitlement to relief." *Starr*, 652 F.3d at 1216. Under *Monell*, Plaintiffs' allegations must plausibly suggest that (1) Plaintiffs suffered an underlying constitutional deprivation; (2) that the Entity Defendants had a policy; (3) that the policy amounted to deliberate indifference; and, (4) that the policy was the "moving force" behind the underlying constitutional violation. *Dougherty*, 654 F.3d at 900. First, Plaintiffs in the instant case allege an underlying constitutional violation through Plaintiffs' individual 42 U.S.C. § 1983 claim against Deputy Gonzalez, as addressed above. *See* SAC ¶ 74. Second, Plaintiffs allege that the Entity Defendants had a policy

of failing to properly supervise and train staff for the standard of care when interacting with "victims of crimes" and individuals suspected to be dangerous. SAC ¶¶ 79–80. Third, Plaintiffs allege that the Entity Defendants acted with deliberate indifference when the Entity Defendants "knew the substantial risk of harm caused by" the failure to train and yet failed to take remedial action. *Id.* ¶ 81. Fourth, Plaintiffs allege that the policy resulted in Plaintiffs' injury because with proper training, Plaintiffs would not have been harmed. *See id.* ¶¶ 82–83. Taking these allegations as true, as the Court must on a motion to dismiss, Plaintiffs plausibly satisfy all the elements of a *Monell* claim.

The Court is unpersuaded by the Named County Defendants' arguments to the contrary. The crux of the Named County Defendants' argument is that Plaintiffs have not alleged a policy or custom with a sufficient causal relation to Plaintiffs' injuries. *See* Mot. at 12–15 ("There simply is no causal link between any policy, practice or custom and the attack of Plaintiffs at the hands of a non-County actor."). Specifically, the Named County Defendants argue that Plaintiffs fail to allege a policy or practice that was the "proximate cause" of Plaintiffs' injury or that "created the requisite 'dangerous environment.'" *Id.* However, as stated above, Plaintiffs specifically allege a failure to train, which courts recognize as sufficient to support a *Monell* claim. *See, e.g.*, *Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1159 (9th Cir. 2012) (explaining that "a failure to train can be a 'policy' under *Monell*.").

The question of whether the alleged failure to train is enough to ultimately satisfy *Monell* is premature at the motion to dismiss stage. Instead, as stated above, the inquiry here is simply whether the factual allegations "plausibly suggest" a claim. *Starr*, 652 F.3d at 1216. Therefore, the Named County Defendants must provide a plausible alternative explanation that renders Plaintiffs' explanation "implausible." *Id.* at 1217 ("Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *implausible*." (emphasis in original)). Here, the Court finds that the Named County Defendants have given no alternative explanation such that the Entity Defendants' alleged failure to train cannot plausibly establish a *Monell* claim.

As such, the Court finds that Plaintiffs have sufficiently pleaded a *Monell* claim under a failure to train theory. Accordingly, the Court DENIES the Named County Defendants' motion to dismiss Plaintiffs' *Monell* claim against the Entity Defendants.

## C. Plaintiffs' Negligence Claim Is Not Barred by State Law Immunities

Finally, Plaintiffs allege that the Named County Defendants are liable under a theory of common law negligence. Plaintiffs contend that: (1) Deputy Gonzalez is liable for negligence under California Government Code § 820(a) by failing to fulfill his duty to exercise ordinary care; and (2) the Entity Defendants are liable under a theory of vicarious liability under California Government Code § 815.2(a). SAC ¶¶ 85–88. Broadly, the underlying factual allegations of Plaintiffs' negligence claim mirrors Plaintiffs' state-created danger claim addressed above. Specifically, Plaintiffs allege that Deputy Gonzalez acted negligently when Deputy Gonzalez increased the "risk of harm" to Plaintiffs by engaging with Millar, agitating Millar, and then not taking any preventative actions before leaving the scene. *Id.* Plaintiffs allege that Deputy Gonzalez is liable for this negligence and that the Entity Defendants are vicariously liable for Deputy Gonzalez's actions. *Id.*

The Named County Defendants do not argue that Plaintiffs fail to sufficiently state a negligence claim. Instead, the Named County Defendants assert a number of state law immunity-related defenses. *See* Mot. at 15–20. Specifically, the Named County Defendants allege that Plaintiffs' state law negligence claim is statutorily barred by the County's immunity and California Government Codes §§ 815, 820.2, 855.6, 855.8, 818.8, 822.2, 845, and 846. The Court addresses each alleged bar in turn.

### 1. The County's Immunity Under § 815 Does Not Bar Plaintiffs' Negligence Claims

First, the Named County Defendants argue that Plaintiffs' negligence claims against the Entity Defendants are barred because "under the California Tort Claims Act, such claims are not actionable against the County, a public entity, absent a specific statutory provision to the contrary." Mot. at 15. The Named County Defendants specifically point to California Government Code § 815 for immunity, which states in relevant part:

25

Except as otherwise provided by statute: (a) *A public entity is not liable for an injury*, whether such injury arises out of an act or omission of the public entity or a public employee or any other person.

Cal. Gov. Code § 815. (emphasis added)

The Named County Defendants argue that this statute, coupled with the relevant case law, "confirms that '[t]here is no common law governmental tort liability in California; and except as otherwise provided by statute, there is no liability on the part of a public entity for an act or omission of itself.'" Mot. at 17 (quoting *Cowing v. City of Torrance*, 60 Cal. App. 3d 757, 761 (1976)). Plaintiffs respond that the Named County Defendants "conflate the direct liability of a public *entity* . . . with an entity's vicarious liability for injuries caused by a public *employee*." Opp'n at 16 (emphasis in original). Plaintiffs contend that the Entity Defendants' vicarious liability "is the same as that of a private person" in the "absen[ce] [of] a specific immunity." *Id.* at 15–16.

The Court agrees that Plaintiffs' claims of negligence against the Entity Defendants are not barred by § 815. As Plaintiffs argue, the SAC alleges that the Entity Defendants are "vicarious[ly] liable for the negligence of Defendant [Deputy] Gonzalez and Does." SAC ¶ 85. Plaintiffs do *not* allege that these two entities are *directly* liable for negligence. *See* Opp'n at 16; *see also* SAC ¶¶ 85–88. This distinction is important because § 815 blocks claims against public entities absent a statutory provision to the contrary. *See* Cal. Gov. Code § 815. However, § 815.2 explicitly provides for vicarious liability, and § 815.2(a) states that "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment." *Id.* § 815.2. Indeed, as this Court has previously recognized, "under California law municipalities enjoy no special immunity for negligence actions [and that a municipality] is liable for the negligence of [its employees] to the same extent that [the employees] would be liable individually." *Hernandez v. City of San Jose*, No. 16-CV-03957-LHK, 2016 WL 5944095, at *45–46 (N.D. Cal. Oct. 13, 2016). While the Named County Defendants cite extensive case law for the applicability of § 815, this case law only demonstrates the applicability of § 815 to direct liability. Indeed, many cases cited by the Named County Defendants highlight the viability of a

26

claim of vicarious liability. *See, e.g.*, *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 840 (9th Cir. 1996) ("Section 815.2 provides for respondeat superior liability . . . ."); *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1082 (Cal. Ct. App. 2004) ("[The city] is also liable for that portion of the judgment attributable to [the employee's] negligence under undisputed principles of vicarious liability.").

Therefore, because Plaintiffs' negligence claim against the Entity Defendants relies on a theory of vicarious liability, the Court finds that § 815 does not bar Plaintiffs' claim. Accordingly, the Court DENIES the Named County Defendants' motion to dismiss on § 815 immunity grounds.

### 2. Immunity for "Discretionary Acts" Under § 820.2 Does Not Bar Plaintiffs' Negligence Claim

The Named County Defendants further argue that Plaintiffs' claim against Deputy Gonzalez is barred under Cal. Gov. Code § 820.2, which "provides immunity for 'discretionary acts' of public employees." Mot. at 15–17 ("For his part as a government employee, [Deputy] Gonzalez is also statutorily immune [under § 820.2] from negligence."). Cal. Gov. Code § 820.2 states:

> Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused.

The Named County Defendants argue that this immunity for "discretionary acts" extends to the instant case and "bars Plaintiffs' claims that liability arises from the decision to not issue a report regarding the first incident [on June 27th], and not to detain Millar or otherwise prevent him from acting on August 15, 2018." Mot. at 17–18. Plaintiffs respond that "discretionary acts" in the context of § 820.2 "provides discretionary immunity 'only for basic policy decisions, not for ministerial implementation of that basic policy.'" Opp'n at 17 (quoting *Ogborn v. City of Lancaster*, 101 Cal. App. 4th 448, 460 (2002)). As such, Plaintiffs argue that § 820.2 immunity does not cover Deputy Gonzalez's actions where Deputy Gonzalez "negligently inflicted personal injury." *Id.*

As an initial matter, the Court disagrees with the Named County Defendants'

1   characterization of Plaintiffs' negligence claim.  The Plaintiffs negligence claim does not rest on

2   "the decision to not issue a report . . . and not to detain Millar or otherwise prevent him from

3   acting" as the Named County Defendants argue.  Mot. at 18.  Instead, Plaintiffs claim that Deputy

4   Gonzalez's negligence liability arises from his interaction with Millar, which increased the danger

5   to Plaintiffs, and subsequent departure from the scene without undertaking preventative actions.

6   *See* Opp'n at 16; *see also* SAC ¶¶ 86–87.

7           Turning to immunity under § 820.2, the Court agrees with Plaintiffs that precedent

8   establishes that "discretionary acts" in the context of § 820.2 "applies only to policy decisions, not

9   to operational decisions."  *Mendez v. City of Los Angeles*, 897 F.3d 1067, 1084 (9th Cir. 2018);

10  *see also Caldwell v. Montoya*, 10 Cal. 4th 972 (1995) ("[W]e cautioned, immunity applies only

11  to *deliberate and considered* policy decisions . . . ." (emphasis in original)).  Additionally, the

12  "classification of the act of a public employee as 'discretionary' will not produce immunity

13  under [§] 820.2 if the injury to another results . . . from his negligence in performing [the act] after

14  having made the discretionary decision to do so."  *McCorkle v. City of Los Angeles*, 70 Cal. 2d

15  252, 261 (1969).  For instance, in *Mann v. State of California*, 70 Cal. App. 3d 773 (Cal. Ct. App.

16  1977), the California Court of Appeal found that § 820.2 did not provide immunity to a state

17  traffic officer where the officer investigated stranded motorists, ultimately "leaving the motorists

18  in a dangerous situation on a freeway where some were subsequently killed and others injured."

19  *Id.* at 776–78.  While the Court did not decide whether the initial decision to investigate was

20  "discretionary," the Court found that "once [the officer] decided to investigate, any negligence on

21  his part in his ministerial performance of the investigation was *clearly beyond* the protection of the

22  statutory discretionary immunity [from § 820.2]."  *Id.* at 778 (emphasis added); *see also Green v.

23  City of Livermore*, 117 Cal. App. 3d 82 (Cal. Ct. App. 1981) (reaching a similar conclusion on

24  similar facts).

25          Here, the Court finds § 820.2 does not apply because Plaintiffs allege that Deputy

26  Gonzalez's negligence stems from his interaction with Millar and subsequent departure, rather

27  than any deliberate and considered policy decision.  *See* Opp'n at 18; SAC ¶¶ 85–86.  As in *Mann*,

28
Case No. 19-CV-02096-LHK
ORDER DENYING MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

once Deputy Gonzalez chose to appear on the scene, Deputy Gonzalez's subsequent actions were not discretionary, and his negligence was not covered by § 820.2. *See Mann*, 70 Cal. App. 3d at 778. Indeed, the Named County Defendants make no argument that Deputy Gonzalez's decisions on how to proceed in his interactions with Millar were a deliberate and considered policy decision. *See* Mot. at 17–18. Instead, the Named County Defendants mischaracterize Plaintiffs' negligence claim and argue that "the decision to arrest or not arrest is a discretionary decision." Mot. at 17 (citing *Michenfielder v. City of Torrance*, 28 Cal. Supp. 3d 202 (1972)). However, as discussed above, Plaintiffs' negligence claim does not necessarily rely on Deputy Gonzalez's failure to arrest Millar, and thus the Named County Defendants' reliance on *Michenfielder* is misplaced.

In sum, the Court finds that § 820.2 immunity for "policy decisions" does not extend to the facts of the instant case, in which Plaintiffs allege that Deputy Gonzalez negligently created a risk and then departed the scene. Accordingly, the Court DENIES the Named County Defendants' motion to dismiss on § 820.2 immunity grounds.

### 3. The Remaining Immunities Do Not Bar Plaintiffs' Negligence Claim

In addition to the above immunities, the Named County Defendants cite a host of California statutory immunities. *See* Mot. at 18–20. Specifically, the Named County Defendants argue that California Government Codes §§ 855.6, 855.8, 818.8, 822.2, 845, and 846 bar Plaintiffs' negligence claims. *Id.* The Named County Defendants argue that these statutes preclude liability from Deputy Gonzalez's "failure to make a mental examination of Millar" (§ 855.6), "failure to diagnose [Millar's] alleged mental illness" (§ 855.8), commission of any misrepresentation (§§ 818.8, 822.2), and failure to "provide police protection service" (§ 845) or to arrest Millar (§ 846). *Id.* Plaintiffs respond that the negligence claim does not rely on these grounds, and instead argue that "[t]he problem here is not that the police failed to respond, the problem is that Deputy Gonzalez came by unannounced . . . ignited Millar's pathologically short fuse and then . . . drove away." Opp'n at 18.

The Court agrees that the foregoing immunities do not bar Plaintiffs' negligence claim. Specifically, California Government Codes §§ 855.6, 855.8, 818.8, and 822.2 do not bar Plaintiffs'

negligence claim in the instant case because Plaintiffs' negligence claim does not necessarily depend on Deputy Gonzalez's failure to diagnose or treat Millar, nor does the claim depend on any affirmative misrepresentation allegedly made by Deputy Gonzalez. *See* Opp'n at 18 ("Plaintiffs do not contend that Deputy Gonzalez should have diagnosed the psychological cause of Millar's bizarre outburst, . . . . Plaintiffs contend that Deputy Gonzalez should have called a supervisor and, at a minimum, summoned backup . . . ."). Instead, Plaintiffs' negligence claim alleges that Deputy Gonzalez endangered Plaintiffs by agitating Millar and then failing to exercise ordinary care. *See* SAC ¶¶ 86–87 ("Defendants in their interaction with Defendant Millar clearly increased th[e] risk of harm substantially by not taking appropriate action . . . .").

California Government Code § 845 also does not bar Plaintiffs' negligence claim. California Government Code § 845 provides immunity "for failure to establish a police department or otherwise to provide police protection service or, if police protection service is provided, for failure to provide sufficient police protection service." Cal. Gov. Code § 845. California courts have indicated that this immunity provision "was designed to prevent political decisions of policy-making officials of government from being second-guessed by judges and juries in personal injury litigation." *Mann*, 70 Cal. App. 3d at 778. By contrast, "section 845 was not intended to provide immunity against a particular police officer's negligence in the performance of his duty in a particular situation." *Wallace v. City of Los Angeles*, 12 Cal. App. 4th 1385, 1402 (1993). Plaintiffs' negligence claim concerns "a particular officer's negligence in the performance of his duty," and not any political decision about the scope of police protection provided to citizens. *Id.* Accordingly, California Government Code § 845 does not provide immunity from Plaintiffs' negligence claim.

Finally, California Government Code § 846 does not bar Plaintiffs' negligence claim. California Government Code § 846 provides that "[n]either a public entity nor a public employee is liable for injury caused by the failure to make an arrest." Cal. Gov. Code § 846. Here, Plaintiffs do not argue that Deputy Gonzalez was negligent because Deputy Gonzalez "should have arrested Millar." Opp'n at 18. Instead, the SAC premises Plaintiffs' negligence claim on the

30

allegation that Deputy Gonzalez "failed to exercise ordinary care in his interactions with Plaintiff Mackie as a crime victim and Defendant Millar as a mentally deranged criminal perpetrator." SAC ¶ 87. Specifically, according to Plaintiffs, Deputy Gonzalez "provok[ed] Defendant Millar with Deputy Gonzalez's unannounced presence without calling for backup or providing Plaintiffs adequate security." *Id.* ¶ 86. At the motion to dismiss stage, the Court does not read Plaintiffs' negligence claim as based on Deputy Gonzalez's failure to *arrest* Millar. To the extent Plaintiffs do eventually intend to argue that Deputy Gonzalez should have arrested Millar, however, this negligence theory is barred by California Government Code § 846. *See, e.g.*, *City of Sunnyvale v. Superior Court*, 203 Cal. App. 3d 839, 842 (1988) ("First, as a matter of sound policy the Legislature has provided immunity for the consequences of a decision not to arrest; hence no duty can be premised on any omission to take [perpetrators] into custody.").

In sum, none of the immunities the Named County Defendants cite bars Plaintiffs' negligence claim. Indeed, as Plaintiffs highlight, California courts have previously found liability in analogous situations in which an officer acted affirmatively in *increasing* a risk of danger to plaintiffs. *See Lugtu v. California Highway Patrol*, 26 Cal. 4th 703, 716–17 (2001) (allowing a claim where an officer "placed plaintiffs in a dangerous position and created a serious risk of harm to which they otherwise would not have been exposed."); *see also Zelig v. County of Los Angeles*, 27 Cal. 4th 1112, 1129, 1141–47 (2002) ("Liability may be imposed if an officer . . . undertakes affirmative acts that increase the risk of harm to the plaintiff.").

As such, because Plaintiffs allege that Deputy Gonzalez negligently interacted with Millar and then departed the scene without taking any precautions, the Court finds the immunities contained within §§ 855.6, 855.8, 818.8, 822.2, 845, and 846 do not bar Plaintiffs' negligence claim. Accordingly, and in light of the foregoing analysis, the Court DENIES the Named County Defendants' motion to dismiss on California statutory immunity grounds.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES the Named County Defendants' motion to dismiss the Second Amended Complaint.

United States District Court
Northern District of California

**IT IS SO ORDERED.**

Dated: March 13, 2020

_Lucy H. Koh_
_____
LUCY H. KOH
United States District Judge